CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

BARBARA J. VALLIERE (DCBN 439535)
PATRICK K. O'BRIEN (CABN 292470)
RICHARD EWENSTEIN (CABN 294649)
Assistant United States Attorneys

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7039
     FAX: (415) 436-7234
     barbara.valliere@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>JOSEPH PODULKA,<br><br>    Defendant. | CASE NO. 24-CR-00243-002 WHA<br><br>UNITED STATES' SENTENCING MEMORANDUM<br><br>Sentencing Date: August 26, 2025<br>Location: Courtroom No. 12, 19th Floor<br>Time:  2 p.m. |

**TABLE OF CONTENTS**

I.  INTRODUCTION ...........................................................................................................1

II.  BACKGROUND ...........................................................................................................1

    A.  Overview of Offense Conduct And Relevant Conduct................................... 1

        1.  Cred, moKredit, and the Hedging Strategy……………………………….3

        2.  The Flash Crash and its Aftermath ……………………………………….4

        3.  Cred's Hole Gets Deeper …………………………………………….…..5

    B.  Procedural History …………………………………………………………6

    C.  Victim Notification and Victim Impact …………………………………….7

        1.  Notification …………………………………………………….………..7

        2.  Impact …………………………………………………………………..8

    D.  Restitution ………………………………………………………………….9

III.  THE ADVISORY GUIDELINES CALCULATION ................................................. 10

IV.  DISCUSSION ............................................................................................................. 11

    A.  Legal Standards............................................................................................ 11

    B.  The Court Should Accept the Parties' Plea Agreement and Stipulated Sentencing Range………………………………………………………………………….11

    C.  The Government's Sentencing Recommendation…………………………………13

        1.  Nature and circumstances of offense/history and characteristics of defendant…13

        2.  Need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense…..15

        3.  Need for the sentence to afford adequate deterrence to criminal conduct ..…….15

        4.  Need for the sentence to protect the public from further crimes by defendant…16

        5.  Need to avoid unwarranted sentenced disparities among similarly situated defendants …………………………………………………………………16

    D.  Restitution …………………………………………………………………….17

        1.  The Court should order restitution for cryptocurrency losses in their value in U.S. dollars …………………………………………………………………..18

        2.  The Court should value the cryptocurrency as of the date of the sentencing ..…19

V.      CONCLUSION..............................................................................................................22

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Davis*,
  No. 24-3090, 2025 WL 2184111 (9th Cir. Aug. 1, 2025) ................................................................. 18, 20

*In re Morgan*,
  506 F.3d 705 (9th Cir.  2007) ........................................................................................................ 12

*In re Vasquez-Ramirez*,
  443 F.3d 692 (9th Cir. 2006) ......................................................................................................... 12

*Lagos v. United States*,
  584 U.S. 577 (2018) ....................................................................................................................... 18

*People v. Ung*,
  88 Cal. App. 5th 997 (2023) .......................................................................................................... 21

*United States v. Carty*,
  520 F.3d 984 (9th Cir. 2008) ......................................................................................................... 11

*United States v. Dubose*,
  146 F.3d 1141 (9th Cir. 1998) ....................................................................................................... 18

*United States v. Frank,*
  36 F.3d 898 (9th Cir. 1994) ........................................................................................................... 12

*United States v. Gossi*,
  608 F.3d 574 (9th Cir. 2010) ......................................................................................................... 20

*United States v. Ichioka*, No. 23-cr-00190-VC,
  2024 WL 2822926 (N.D. Cal. June 4, 2024) ........................................................................... 20, 21

*United States v. Kaplan*,
  839 F.3d 795 (9th Cir. 2016) ......................................................................................................... 20

*United States v. Kuhlman*,
  711 F.3d 1321 (11th Cir. 2013) ..................................................................................................... 15

*United States v. Kyle,*
  734 F.3d 956 (9th Cir. 2013) ......................................................................................................... 12

*United States v. Martin*,
  455 F.3d 1227 (11th Cir. 2006) ..................................................................................................... 15

*United States v. Sample*,
901 F.3d 1196 (10th Cir. 2018) ..................................................................................... 15

**Statutes**

18 U.S.C. § 1349 ............................................................................................................... 1

18 U.S.C. § 3553(a) ........................................................................................................ 11

18 U.S.C. § 3663(d) ........................................................................................................ 18

18 U.S.C. § 3663A(b)(1).............................................................................................. 18, 20

18 U.S.C. § 3664(d)(6) .................................................................................................... 21

18 U.S.C. § 3771(a)(2) ...................................................................................................... 7

**Rules**

Fed. R. Crim. P. 11(a)(1) ................................................................................................ 10

Fed. R. Crim. P. 11(c)(1) .............................................................................................. 1, 12

Fed. R. Crim. P. 11(c)(5) ................................................................................................ 12

Fed. R. Crim. P. 11(c)(5)(C) .......................................................................................... 12

U.S.S.G. Ch. 2.................................................................................................................. 10

U.S.S.G. Ch. 3.................................................................................................................. 10

U.S.S.G. Ch. 4.................................................................................................................. 10

U.S.S.G. §2B1.1(a)(1)...................................................................................................... 10

U.S.S.G. § 4C1.1.............................................................................................................. 10

## I. INTRODUCTION

Pursuant to Criminal Local Rule 32-5(b), the United States respectfully submits its sentencing memorandum in the above-captioned case. On May 5, 2025, the defendant, Joseph Podulka, pleaded guilty to Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 with a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)C). For the reasons set forth below, the United States recommends a sentence of a 40 months' imprisonment, followed by three years supervised release, a $25,000 fine, a special assessment of $100, and restitution in the amount of no less than $169,076,613.37.

## II. BACKGROUND

### D. Overview of Offense Conduct and Relevant Conduct

From 2018 through 2020, Cred LLC (Cred), a company found by Daniel Schatt and Lu Hua and located in the Northern District of California, provided financial services to holders of cryptocurrency ("crypto") and other assets. On November 7, 2020, Cred collapsed and filed for bankruptcy, causing losses to the victims of more than $140 million.[1]

Schatt and Hua started Cred in 2018. At its core, Cred was designed to attract customers to its products by promising that they would earn a significant yield on their crypto assets without needing to sell the assets, something that was difficult to obtain in 2018. What was unknown to most Cred customers was that Cred largely relied on one entity -- a Chinese company called moKredit founded by Cred's cofounder and half-owner Hua -- to generate the interest payments that provided that yield. What was also largely unknown to Cred customers was that moKredit generated the money Cred used to pay interest to its customers by making micro-loans to Chinese gamers.

Despite this heavy reliance on moKredit to generate yield, throughout 2019, Cred continued to grow and gain customers. Schatt hired employees, including defendant Joseph Podulka as the Chief Financial Officer (CFO), and Cred partnered with other crypto-related businesses, finalized and launched something called the CredEarn program, and generally timely paid the promised interest on its

---

[1] At the time of the bankruptcy, the loss cryptocurrency assets were valued at approximately $140 million. Since that time, the value of the cryptocurrency has increased dramatically and as of conversion rates for currencies as of August 10, 2025, at 11:59 pm is worth approximately $1.15 billion.

customers' loaned crypto. In its marketing materials and to its employees, Cred painted a rosy picture of the future heading into 2020.

The rosy-looking future evaporated nearly overnight in March of 2020. On March 11, 2020, the price of Bitcoin dropped precipitously, by about 40 percent, and that single instance of market volitivity laid bare cracks in Cred's foundation. Within days of the so-called "flash crash," Cred learned from its hedging partner that it was underwater and needed to liquidate all its trading positions. The hedging partner then abruptly ceased to do business with Cred and threatened to sue, leaving Cred with no hedges and no hedging strategy going forward. Cred quickly learned that moKredit -- to which by then it had lent at least $40 million dollars -- would be unable to repay the principal to help stop the bleeding. Three internal liquidity analyses done in April, July, and September of 2020 and shared with CEO Schatt and CFO Podulka revealed Cred to be in dire straits. In essence, immediately following the "flash crash" and for the seven months before it abruptly declared bankruptcy in November, Cred was effectively insolvent. Neither Podulka nor Schatt nor any other Cred employee ever revealed these facts to Cred's customers.

Despite this dismal reality, codefendant Schatt, defendant Podulka, and until late June 2020, Chief Capital Officer (CCO) James Alexander, tried to keep the company afloat by bringing in new customer funds and keeping requests for redemptions from existing customers at bay. But instead of revealing to its customers (or even to most of its own employees) Cred's drastically changed landscape (*i.e.*, its near insolvency, its lack of a hedging strategy, and the fact that moKredit was not paying back loan principal), Schatt, Podulka, and, for a time, Alexander continued to paint the same rosy picture of the company's health that they did pre-flash crash. In so doing, they withheld critical information and made or authorized the making of misleading statements to prospective and existing customers and investors about, among other things, Cred's financial security, its (now nonexistent) hedging strategy, and its ability to recover any loss of customers funds through insurance.

On November 7, 2020, following weeks of turmoil during which it was revealed to one of its partners that it was basically insolvent, Cred declared bankruptcy.

### 1. Cred, moKredit, and the Hedging Strategy[2]

Cred LLC or Cred Inc. (Cred), headquartered in San Francisco, California, was founded in 2018 by defendant and Lu Hua to serve as a global financial services platform serving retail and institutional clients. Presentence Investigation Report (PSR) ¶ 7. Schatt and Hua each owned 50 percent of Cred, and Schatt served as its CEO. PSR ¶¶ 15-16. moKredit, Inc. (moKredit) was a lending platform owned by Hua based in Shanghai, China that provided microcredit loans to Chinese borrowers. moKredit allowed video game participants in China to obtain unsecured micro loans for tokens to play video games. PSR ¶ 8.

During 2018, Cred developed two products: CredBorrow and CredEarn. CredEarn, the more popular of the two, allowed customers to deposit cryptocurrency with Cred for a predetermined period and earn a yield on that currency of up to 12 percent. PSR ¶ 17. In July of 2019, Joseph Podulka joined Cred as its CFO and served as one of Schatt's closest advisors. PSR ¶ 14. From the time he joined Cred, defendant understood that moKredit was the sole entity with which Cred placed CredEarn funds to generate income. PSR ¶ 18. Defendant also knew that the arrangement with moKredit created risk for Cred based on potential price fluctuations in the cryptocurrency market. PSR ¶ 19. The risk of Cred finding itself in a short negative position was mitigated through a hedging strategy devised by Cred's Chief Operating Officer, James Alexander, and a company called JST Capitol (JST). PSR ¶¶ 19-21. The upshot of this hedging strategy was that 80 percent of incoming customer cryptocurrency funds were loaned to moKredit, while 20 percent were held back to serve as margin for future contracts. PSR ¶ 19.

Beginning in early 2019, Cred partnered with Uphold, a cryptocurrency exchange that marketed to retail customers, to promote Cred products on Uphold's platform. PSR ¶ 22. As part of its their agreement, Cred warranted to Uphold that it was "solvent and has sufficient capital (or immediately available liquid access thereto) to perform its obligations." PSR ¶ 23.

---

[2] Unless otherwise noted, the information presented here is drawn from the Indictment, the Presentence Investigation Report (PSR), or the Government's Opposition to Defendants' Motion to Dismiss Indictment in Part and to Strike Omissions Theory as Insufficiently Pleaded, or, in the Alternative, for a Bill of Particulars.

Throughout 2019 and into early 2020, Cred's sole means of generating income to pay the interest on the CredEarn loans was interest it earned from loans to moKredit. PSR ¶ 24. As of January 2020, no principal payments on the moKredit loans had been due, so moKredit had paid back very little of the principal of the roughly $40 million Cred had lent it. PSR ¶ 24.

### 2. The Flash Crash and its Aftermath

On March 11, 2020, the price of Bitcoin (BTC) dropped by approximately 40 percent. PSR ¶ 26. That afternoon, JST informed Cred that (1) all of Cred's BTC had been liquidated, (2) Cred now had a short position of $27,483,181, (3) for every $100 move in BTC, Cred would make or lose around $400,000, and (4) it needed an additional $3,000,000 collateral as soon as possible to meet margin calls. PSR ¶ 26. Cred immediately recalled $10 million in principal from moKredit to cover the losses, PSR ¶ 27, while Schatt sent a reassuring email to Cred customers. PSR ¶ 28. Customers who received the email believed that Cred had not been impacted "at all" by the flash crash, PSR ¶ 29. None of the customers were informed that Cred no longer was hedging against volatility or that it had requested a large cash infusion from moKredit. PSR ¶ 29.

By the next afternoon and in the days thereafter, Cred's General Counsel sought reassurance from Schatt and defendant that the company was solvent. PSR ¶ 30. Schatt responded that it was and told the General Counsel to take "direction" from defendant on the financials. PSR ¶ 30. The day after that exchange, JST informed Cred that its hedging positions had all been liquidated and ended its relationship with Cred. PSR ¶ 31. With Cred inadequately hedged to manage the risk associated with $40 million owed by moKredit, defendant knew and understood that Cred was exposed to significant risk if crypto prices increased substantially over a relatively short period. PSR ¶ 31. On March 18, 2020, Schatt conducted a public Ask Me Anything (AMA) session and provided misleading information about Cred's financial situation by claiming that the business was "operating normally." PSR ¶ 32. Less than a week after that AMA, moKredit told Schatt and other Cred executives that it could not repay the loan principal and suggested a repayment schedule that would include $4 million in June and $4 million in July. PSR ¶ 33. Thereafter, however, moKredit did not make these payments and paid only a fraction of the principal. PSR ¶ 33. By the end of July, Schatt and defendant were aware that moKredit had not made these payments as promised. PSR ¶ 35. Nonetheless, neither defendant nor Schatt

disclosed moKredit's failure to make these payments to Cred customers or potential Cred investors. PSR ¶ 35.

### 3. Cred's Hole Gets Deeper

Meanwhile, Cred suffered two other losses. First, on June 24, 2020, Schatt fired James Alexander. PSR ¶ 37.[3] Alexander then directed an employee to transfer approximately 225 Bitcoin located in the Cred Capitol account to a Cred Capitol consultant. PSR ¶ 37. On July 1, 2020, Alexander transferred the Bitcoin to a wallet under his control and began using the Bitcoin for his own purposes. PSR ¶ 37.[4] Second, in late July 2020, Cred asked one of its asset managers, QuantCoin, to repay Cred some of the Bitcoin Cred had sent to it. PSR ¶ 40. QuantCoin failed to return the requested Bitcoin, and within weeks, Cred learned that the asset manager was a fraud, and that Cred had been the victim of a scam. PSR ¶ 40. Despite these events, in communications with current and potential customers and investors, defendant continued to describe Cred's financial status and health positively, knowingly failing to disclose negative information. *See* PSR ¶¶ 41-42.

In the summer of 2020, defendant provided financial statements to a customer that described almost $40 million that Cred had sent to moKredit as an asset without providing information about moKredit's failure to pay Cred on the agreed-upon schedule, an omission that left a misleading impression regarding Cred's financial health. PSR ¶ 44. After receiving this financial information from defendant, the customer invested approximately $1.5 million with Cred in August 2020. PSR ¶ 44.

In October 2020, one Cred customer, in deciding whether to reenroll her $3.8 million loan, sought specific reassurance from defendant about Cred's financial stability. PSR ¶ 43. On October 12, 2020, defendant sent this customer a letter with Schatt's knowledge that provided only reassuring information and claiming that the company had the resources to meet expected principal redemptions

---

[3] After Alexander was fired, the sale team reported directly to Schatt and, regarding questions about the company's financial health, to defendant. PSR ¶ 39. The sales team reported that neither Schatt nor defendant mentioned any liquidity problems at Cred and continually told them "how great everything was at Cred." PSR ¶ 39. Based on these reassurances from Schatt and, about financial matters, Podulka, the sale teams continued to market Cred products as if nothing had changed. PSR ¶ 39.

[4] Alexander is charged in a separate Indictment. *See United States v. James Alexander*, 24-CR-000242.

through the end of the year "even if no additional funds are brought in." PSR ¶ 43. Shortly after the letter was sent, the customer reenrolled. PSR ¶ 43.

Within weeks of Cred sending that letter, on October 23, 2020, Uphold learned from a CoinDesk reporter that Cred had lost "a bunch of money." PSR ¶ 46. Uphold brass convened a call with defendant, Podulka, and Cred's General Counsel. PSR ¶ 46. During the call, Cred officials revealed to Uphold for the first time that (1) Cred had lost about $8 million from the QuantCoin theft; (2) Cred had long ago stopped hedging its crypto; and (3) Cred was presently in the hole by "tens of millions" of dollars. PSR ¶ 46. By the end of the call, Cred executives acknowledged that it was insolvent. PSR ¶ 46. Within days, Uphold terminated its relationship with Cred. PSR ¶ 47. Cred declared bankruptcy on November 7, 2020. PSR ¶ 50. On November 9, 2020, Schatt filed a declaration in support of Cred's Chapter 11 petition. Indictment, ¶ 76. In that petition, defendant claimed that Cred's financial difficulties were primarily due to Alexander's "malfeasance," including his appropriation of 225 Bitcoin on June 24, 2020, and his alleged failure to conduct proper due diligence on QuantCoin. Indictment, ¶ 76.

### E.    Procedural History

On May 1, 2024, the grand jury returned an Indictment charging defendant and CEO Schatt with conspiracy to commit wire fraud, wire fraud, and money laundering. Docket (Dkt.) 1 Indictment ("Indict."). Paragraph 26 of the Indictment alleged that the defendants "engaged in a scheme, plan, and artifice to defraud, among others, Cred's customers and investors as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promise[s], by making materially false and misleading statements, and failing to disclose facts with a duty to disclose." Dkt. 1 ¶ 26. On October 8, 2024, the Court set the case for trial on July 7, 2025. Dkt. 73. Thereafter, the parties litigated a single pretrial motion, a Motion to Dismiss Indictment in Part and to Strike Omissions Theory as Insufficiently Pleaded, or, in the Alternative, for a Bill of Particulars, and on January 6, 2025, the Court denied it. Dkt. 81. On May 13, 2025, Podulka pleaded guilty pursuant to a plea agreement to Count One of the Indictment, Conspiracy to Commit Wire Fraud. Dkt. 95. Sentencing is presently set for August 26, 2025.

### F. Victim Notification and Victim Impact

#### 1. Notification

As noted above, Cred had thousands of customers at the time of its bankruptcy, many of whom submitted claims as creditors in the bankruptcy proceedings. During its investigation, the United States contacted and interviewed many victims about the representations made to them and about their losses. Following the issuance of the Indictment, the United States notified the victims as follows:

On February 10, 2025, the United States contacted by letter all domestic victims with known addresses and asked that they provide email addresses and log into the Victim Notification System (VCN). This notification provided information on the charges in the Indictment and the Crime Victims Recovery Act (CVRA). In addition to direct notification, the United States filed a motion on February 26, 2025, seeking permission from the Court to use the Department of Justice's website for large cases as an alternative victim notification procedure under 18 U.S.C. §§ 3771(a)(2) and 3771(d)(2). Dkt. 85. The Court granted that request on February 27, 2025, Dkt. 86, allowing victims in the case to receive notices since that time on the public website located at https://www.justice.gov/usao-ndca/us-v-daniel-schatt-and-joseph-podulka-24-cr-00243-wha-and-us-v-james-alexander-24-cr.

On April 14, 2025, the United States provided notification through the VCN and on its public site that the parties were engaged in plea negotiations.

On April 21, 2025, the United States provided notification through the VCN and on its public site that the parties had reached a plea agreement, the date on which the change of plea was scheduled to be heard (May 13, 2025), and information about the victims' right to be heard.

On May 23, 2025, the United States provided notification through the VCN and on its public site that the defendant had pleaded guilty, the date on which he was scheduled to be sentenced (August 26, 2025), and information about the victims' right to be heard at the sentencing. The United States also provided a Victim Impact Statement (VIS) template and asked that victims return any VIS by July 8, 2025. The United States supplied all VISs received by that time to probation for inclusion in the PSR.

On August 13, 2025, the United States provided a second notification through the VCN and on its public site that the defendant had pleaded guilty, the date on which he was scheduled to be sentenced (August 26, 2025), and the information about the victims' right to be heard at the sentencing. The

U.S. SENTENCING MEMORANDUM
CR 24-00243-002 WHA                           7

United States also again provided the VIS template and asked that they be submitted before the August 26, 2025, sentencing. In the days following the August 13 notification, the United States received a total of eleven additional VISs and promptly provided those statements to Probation and defense counsel.

Finally, from the early stages of the criminal investigation until now, the United States has been in touch with counsel for the Cred Inc. Liquidation Trust, which itself is in touch with victims of the defendant's scheme, as well as other victims who may have served as potential trial witnesses had the defendant not pleaded guilty.

### 2. Impact

Probation summarized in the PSR the VISs received before filing the final version with the Court (*see* PSR ¶ 55(a)-(o)). In addition to the victims' harm summarized in the PSR, the United States wishes to highlight the following points from the impact statements themselves.

*First*, the letter provided by counsel for the Cred Inc. Liquidation Trust provides an overview of many of the victims' perspective regarding the promises upon which they relied when they lent their fiat and cryptocurrency to Cred. Those promises included that Cred only lent to companies on a collateralized or guaranteed basis, that their cryptocurrency would be hedged against market volatility, and that Cred had comprehensive insurance. The defendant has admitted that, following the crash flash, none of the cryptocurrency was hedged. Moreover, the loans made to moKredit were neither collateralized nor guaranteed which is why moKredit's failure to repay Cred the money that Cred had loaned it left Cred with a large hole that it could not fill. And Cred's comprehensive insurance ultimately covered none of its customers' losses. The Trust reported that it accepted 5,955 general unsecured claims in the bankruptcy totaling $163,072,434.50, valued as of November 6, 2020, the day before the bankruptcy. After four years of attempting to recover Cred assets through litigation, mediation, and negotiated settlements,[5] the Trust reports that it will be impossible to make creditors whole. As the Trust relates and as other VISs attest, even aside from the erosion of these customers' trust in financial institutions, many of the Cred customers viewed their cryptocurrency holdings as the

---

[5] The Trust has not yet made any distributions, but, as of July 14, 2025, it estimates that it will be able to make a distribution of roughly $90,885,950.93.

foundation of their retirement portfolios or were set aside for purchasing homes or establishing college funds for children.

*Second*, even aside from Cred customers and investors, Uphold, Inc. which provided Cred with a platform for its CredEarn product has submitted a claim for over $6,000,000 in losses it suffered due to defendant's conduct and Cred's insolvency. As described above, Uphold was in many ways the impetus behind exposing the defendant's scheme. When in late October 2020 Uphold was alerted by a CoinDesk reporter to the QuantCoin scam, Uphold reached out and facilitated a lengthy call with defendant, co-defendant Podulka, and Cred's General Counsel during which it learned the truth about Cred's financial health including that the company was essentially insolvent. Although Uphold acted quickly to sever ties with Cred to minimize additional loss to its customers, much of the damage to Uphold and its customers by the defendants' scheme had already been done.

*Third*, excerpts from the VISs submitted demonstrate the impact that scheme to defraud had on Cred's customers. Victims report that their experience with Cred has left them with "deep-seated and severe distrust of others," "deep distrust of people in the crypto industry," and "feeling like a fool." It has affected their relationships with others, where "[t]here has been increased stress and tension" between one victim and those he "recommended the CRED platform to." One victim recounted that Cred lied to him directly and gambled away his funds by "giving them to a Chinese short-term loan company that either could not repay or had no intention of repaying." He also notes that "[w]hile they have been honest about the multiple losses Cred incurred, they continued to hide the truth, making the situation worse." These victims recounted the specific hardships incurred by their losses: retirement savings, money to purchase homes, college savings for their children, and money to support aging parents.

### G.    Restitution

In the Plea Agreement, the defendant has agreed to pay restitution in an amount no less than $65,000,000. Dkt. 97, ¶ 10. Based on claims submitted in the bankruptcy proceeding and reviewed by the Cred Liquidation Trust and using a valuation of the cryptocurrency on November 6, 2020, the day before Cred declared bankruptcy, the amount of restitution owed is $163,072,434.50. PSR ¶ 111, n.7. An additional victim has submitted two separate claims for $6,004,178.87. PSR ¶ 111, n. 7. Using

these calculations, the total restitution amount would be $169,076,613.37.  PSR ¶ 111.  However, as noted above, some of the victims in their Victim Impact Statements have requested restitution in the form of their invested cryptocurrency (so-called in-kind repayment), or in the alternative, for the highest dollar value of the cryptocurrency since Cred declared bankruptcy on November 7, 2020.  The United States believes that the Court must decide these preliminary questions before ordering restitution in this case and addresses the legal arguments below in Section IV. D.

## III.    THE ADVISORY GUIDELINES CALCULATION

In the Plea Agreement entered under Federal Rule of Criminal Procedure 11(c)(1)(C), the parties agreed to the following advisory Guidelines range:

| | | |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(1): | 7 |
| b. | Specific offense characteristics under U.S.S.G. Ch. 2 | |
| | § 2B1.1(b)(1)(M) – Loss more than $65,000,000 | + 24 |
| | § 2B1.1(b)(2)(A)(i) – Offense involved 10 or more victims | +2 |
| c. | Adjustments under U.S.S.G. Ch. 3 | |
| | § 3B1.3 – Abuse of Position of Trust | +2 |
| d. | Acceptance of Responsibility: | -3 |
| e. | Adjustments under U.S.S.G. Ch. 4 | |
| | § 4C1.1 – Zero-Point Offender | -2 |
| f. | Adjusted Offense Level: | 30 |

Dkt. 97, Plea Agreement, ¶ 7.  The parties reached no agreement regarding the defendant's Criminal History Category (CHC), *id*., but Probation has concluded that defendant is a CHC I.  PSR ¶ 73. Probation disagrees with the parties' advisory Guidelines calculation, however, concluding that the defendant is not entitled to the two-level reduction as a zero-point offender under U.S.S.G. § 4C1.1 because, based on the Victim Impact Statements it received after the change of plea hearing, he "personally directly caused substantial financial harm" to some of his victims.  PSR ¶ 3 & n.1.  The parties have not objected to this conclusion.  Probation has thus concluded that defendant's adjusted offense level is 32.  PSR ¶ 102.  A CHC I with an adjusted offense level of 30 yields an advisory

Guidelines range of 97 to 121 months' imprisonment. A CHC I with an adjusted offense level of 32 yields an advisory Guidelines range of 121 to 151 months' imprisonment. PSR ¶ 102. In the Plea Agreement, the parties stipulated to a sentencing range of 12 months and one day to 62 months of imprisonment, and the government has agreed to recommend a sentence no greater than 52 months. Dkt. 97, Plea Agreement, ¶ 8. Probation has recommended a sentence of 30 months' imprisonment. *See* PSR, Sentencing Recommendation, p. 1.

## IV.     DISCUSSION

### A.     Legal Standards

The Court should impose a sentence sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also* 18 U.S.C. § 3553(a). The Court should begin the process of determining an appropriate sentence by calculating the correct sentencing range under the advisory Guidelines. *Id*.

After determining the appropriate advisory Guidelines calculation, the Court should then evaluate the sentence for substantive reasonableness considering the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Under Section 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider these factors applicable to this case, among others:

(1)     The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(3)     The need for the sentence imposed to afford adequate deterrence to criminal conduct;

(4)     The need for the sentence imposed to protect the public from further crimes of the defendant; and

(5)     The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

### B.     The Court Should Accept the Parties' Plea Agreement and Stipulated Sentencing Range

The Court may accept or reject a Rule 11(c)(1)(A) or (C) plea agreement, and if the Court rejects it, then the Court must give the defendant an opportunity to withdraw the plea. Fed. R. Crim. P. 11(c)(1)(A); *id.* at 11(c)(5).  If the court rejects a Rule 11(c)(1)(A) or (C) plea agreement, Rule 11(c)(5) dictates the procedures to be followed: (A) inform the parties that the court rejects the plea agreement; (B) advise the defendant personally that the court is not required to follow the plea agreement and give the defendant an opportunity to withdraw the plea; and (C) advise the defendant personally that if the plea is not withdrawn, the court may dispose of the case less favorably toward the defendant than the plea agreement contemplated.  Fed. R. Crim. P. 11(c)(5).  Should the defendant decide to maintain his plea of guilty, the court "may dispose of the case less favorably toward the defendant than the plea agreement contemplated."  Fed. R. Crim. P. 11(c)(5)(C); *see In re Vasquez-Ramirez*, 443 F.3d 692, 696 (9th Cir. 2006).[6]

Rule 11 clearly vests district courts with the discretion to accept or reject plea agreements, including those that contain a stipulated sentence term.  *In re Morgan*, 506 F.3d 705, 709 (9th Cir. 2007) (citing Fed. R. Crim. P. 11(c)(3)(A)).  But "the broad discretion granted by Rule 11 is not unbounded."  *Id.* at 710.  Indeed, courts may not engage in "the categorical rejection of a sentence bargain independent of any consideration of the specific circumstances giving rise to the bargain."  *Id.* at 712; *see also id.* (explaining that the "categorical rejection of sentence bargain plea agreements is error").  Instead, "district courts must consider individually every sentence bargain presented to them and must set forth, on the record, the court's reasons in light of the specific circumstances of the case for rejecting the bargain."  *Id.*

In essence, the Court is being called upon to assess, after conducting "an individualized analysis of the specific circumstances presented," whether the stipulated sentencing range "serve[s] justice on the facts of the case before it."  *Id*. at 711.  As further explained in Section C, the bargain the parties' struck

---

[6]  While the Court may accept or reject the parties' plea agreement, Rule 11(c)(1) instructs that "[t]he court must not participate in the [] [plea agreement] discussions."  Fed. R. Crim. P. 11(c)(1).  This rule is designed "to keep the judge from shaping the plea bargain or persuading the defendant to accept particular terms, and to preserve judicial impartiality."  *United States v. Frank,* 36 F.3d 898, 902 (9th Cir. 1994); *see United States v. Kyle,* 734 F.3d 956, 963 (9th Cir. 2013) ("[W]hen a court goes beyond providing reasons for rejecting the agreement presented and comments on the hypothetical agreements it would or would not accept, it crosses over the line established by Rule 11 and becomes involved in the negotiations.") (internal quotation marks omitted).

here, that the Court impose a sentence between 12 months and a day and 62 months' imprisonment, allows for a reasonable sentence based on both the seriousness of the offense conduct and a variety of unique mitigating factors.

### C. The Government's Sentencing Recommendation

For the reasons explained below, the United States recommends that the Court impose a sentence of 40 months' imprisonment, followed by three years of supervised release, a $25,000 fine, a $100 special assessment, and restitution in the amount of no less than $169,076,613.37. The United States offers the following in support of its recommended sentence.

#### 1. Nature and circumstances of offense/history and characteristics of defendant

A 40-month sentence, a custodial sentence but also a significant reduction from the low end of the advisory Guidelines range, is justified by the nature and circumstances of the offense and by the history and characteristics of the defendant.

Defendant joined Cred as the CFO in the summer of 2019, more than a year after (1) it had been founded by Schatt and Hua, (2) Schatt and Hua struck the deal to make loans to moKredit, and (3) Alexander and JST had developed the hedging strategy. While Cred's future looked rosy during defendant's first eight months, all that changed in March 2020. Defendant has admitted that, after the flash crash on March 11, 2020, he conspired with codefendant Schatt to mislead Cred customers into believing that Cred was "operating normally," despite knowing that Cred was no longer hedging its cryptocurrency against volatile swings in the market. Defendant also continued to provide that the company's overall financial health was stable despite a $40 million hole caused by an unpaid debt by moKredit, the Chinese gaming company owned by Hua. By supporting this claim of "normalcy" and general financial health, defendant assisted Schatt in misleadingly marketing the CredEarn product, taking in millions of dollars from customers and investors who, as the Victim Impact Statements attest, falsely believed that their fiat and cryptocurrency was safe. As the summer of 2020 wore on, defendant provided misleading information about Cred's financial health directly to customers and potential investors, including sending a reassuring and misleading letter on October 12, 2020, to a customer to persuade the customer to re-enroll $3.8 million in the CredEarn program. So assured, the customer re-enrolled and about three weeks later, Cred declared bankruptcy. As the CFO, the person assigned the

task of assessing the company's financial health, defendant bears responsibility not only for misleading the customers he dealt with directly, but also for providing the CEO and Cred sales team with financial data that misleadingly painted Cred in a positive light.

It is true that some outside forces contributed to Cred's misfortunes after the flash crash, both including the flash crash itself and events that unfolded after. Following the March flash crash, moKredit repeatedly cited the COVID 19 epidemic as a cause for its inability to repay the principal of its loans. In July 2020, James Alexander made off with 225 Bitcoin earmarked for Cred Capital, a subsidiary of Cred. In August 2020, the QuantCoin scam was unearthed, revealing the loss of an additional 800 Bitcoin. But before the bankruptcy, defendant did not reveal either moKredit's failure to pay back the loan principal to the customers and investors with whom he dealt, nor did he reveal the QuantCoin scam to CredEarn customers or Cred investors.

That said, it is true that defendant has no prior criminal history, and his acceptance of responsibility for the role that he played in Cred's downfall appears genuine. *See* PSR ¶ 58. While he notes that he should have fought back and confronted the CEO, codefendant Schatt, about the misleadingly positive spin that they were putting on the financial stability of the company, he does not shift blame to others for his role in the offense. Instead, he admits that he wrongfully ignored the reality of the situation which ultimately caused great damage to Cred customers. PSR ¶ 58. His contrition and recognition of the harm that was caused to customers and investors rings true. Moreover, there is no evidence that the defendant profited directly from the fraud, and unlike his codefendant Schatt, he was not a half owner or founder and thus, other than drawing his salary, he did not have a similar financial and personal stake in the company's continued viability.

Regarding defendant's personal characteristics, the PSR notes that defendant had a largely stable childhood although it was not entirely free of strife. *See* PSR ¶¶ 82-83. Until the instant offense, he was lived a life marked by many admirable accomplishments. He is well-educated, has a master's degree, and is married with two teenage children who reside with him and his wife. PSR ¶ 85. He has long been engaged in volunteer work in his community, and he has strong support from his wife, children, and extended family, as well as many friends who describe him as a "devoted family man" who is "intelligent, capable, and deeply kind." PSR ¶¶ 84, 87-88(a)-(h). Many friends noted that defendant had

spoken to them about his actions in this case, and that they believe that he has taken "full responsibility for his actions" and that he wants "to move forward with honesty and accountability."  PSR ¶ 88(a)-(h). Given these characteristics and the other mitigating circumstances surrounding the offense, the government believes a significant downward variance from the Sentencing Guidelines to a sentence of 40 months is sufficient but not greater than necessary to achieve the purposes of sentencing.

2. **Need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

The offense was serious.  Thousands of people entrusted their assets to defendant's company believing, based on Cred's marketing, that their assets would be safe.  The loss amount is huge – just under $140,000,000 valued at the time of the bankruptcy.  It is also loss stemming from fraud in an emerging area – cryptocurrency – where there has long been a perception that it is an "anything goes" market resembling the Wild West.  For that reason, the sentence in this case should not only afford just punishment, it should also promote respect for the law.  The government's recommended sentence would achieve these aims without being greater than necessary.

3. **Need for the sentence to afford adequate deterrence to criminal conduct**

One important aspect of sentencing is the need for the sentence to deter others from committing similar crimes in the future and in the white collar context, "general deterrence is particularly important." *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("[T]he Congress that adopted the § 3553 sentencing factors emphasized the critical deterrent value of imprisoning serious white collar criminals, even where those criminals might themselves be unlikely to commit another offense.")).  "White collar criminals may be particularly susceptible to general deterrence because '[d]efendants in white-collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment.'" *Id.*  (quoting *United States v. Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013)).

Financial markets, even digital ones, depend on trust: customers and investors must be able to trust that when companies promise the safety of their funds, those promises are truthful and ideally fulfilled.  This was especially true here, where Cred's marketing materials emphasized to CredEarn

U.S. SENTENCING MEMORANDUM
CR 24-00243-002 WHA                               15

customers that all of Cred's cryptocurrency position were properly hedged and that Cred could rely on Cred's comprehensive risk management and insurance. While cryptocurrency businesses involve new technology and perhaps new risks, they still operate within the traditional bounds of the law. Here, after the flash crash, Cred customers were increasingly deprived of critical, material information about the company that they needed to make sound decisions about whether to entrust their assets, sometimes significant assets, with Cred. Instead of truthful information, the customers received misleading reassurances about the financial health of the company. This is fraud, and such fraud must be deterred. A 40-month sentence here will serve as a warning to executives even in cutting-edge industries that this type of behavior will be punished.

### 4. Need for the sentence to protect the public from further crimes by defendant

The government believes based on the facts of the case and the information provided in mitigation that, provided he continues to accept full responsibility for his conduct and continues to express remorse, defendant is unlikely to reoffend. This factor therefore weighs in favor of a significant downward variance from the Guidelines, which is reflected in the United States' recommendation.

### 5. Need to avoid unwarranted sentenced disparities among similarly situated defendants

Another factor weighing in favor of the parties' agreement and the United States' recommendation is that the amount of loss, even as conservatively calculated, results in an extraordinarily high and unduly harsh advisory Guidelines sentence. Even at the low end of the advisory Guidelines the sentence here would be either 97 or 121 months' imprisonment, depending on whether the Court accepts the parties' calculations or Probation's. Given the nature of the fraud and the other mitigating circumstances outlined above, the parties agreed that a sentencing range outside the advisory Guidelines range would be sufficient but no greater than necessary to achieve the purposes of sentencing. Indeed, the JCIN information available supports that, nationally, both the average and mean sentences for this offense are outside the advisory Guidelines range. *See* PSR ¶¶ 123-124 & n.14 (noting that the average length of the sentence for defendants with an adjusted offense level of 32 at CHC I is 89 months, and that the median length is 84 months, while the average length of the sentence

for defendants with an adjusted offense level of 30 at CHC I is 75 months, and that the median length is 78 months).

The United States believes that the disproportionate impact that the loss amount would have on this defendant, who has no criminal history, does justify a significant variance from the low end of the advisory Guidelines range. A survey of fraud-related cases with comparable and greater loss amounts revealed that, even post-trial and as the JCIN data reflects, many of the sentences imposed for large-loss cases were below the properly calculated range. Indeed, a survey of a smattering of cases in this district and others revealed sentences, from as low as 12 months to over ten years in prison:

| Defendant | Case No. Trial or Guilty Plea | Approximate Loss Amount | Sentence |
|---|---|---|---|
| Charles W. McCall (McKesson-HBOC Chairman of the Board) | 00-CR-505 WHA (NDCA) Trial | $8.6 billion | 120 months |
| Ebrahim Shabudin (United Commercial Bank Chief Credit Officer) | 11-CR-664 JSW (NDCA) Trial | $677 million | 97 months |
| Elizabeth Holmes (Theranos CEO) | 18-CR-00258 EJD (NDCA) Trial | Over $700 million | 135 months |
| Racho Jordanov (CEO JHL Biotech) | 21-CR-227 WHA (NDCA) Plea | Over $101 million | 12 months and one day |
| Rose Lin (COO JHL Biotech) | 21-CR-227 WHA (NDCA) Plea | Over $101 million | 12 months and one day |
| Alexander Mashinsky (CEO Celsius) | 23-CR-00347 JGK (SDNY) Plea | Over $1.3 billion | 144 months |

The United States' recommended sentence in this case is consistent with the types of sentences imposed in similar cases and would therefore achieve the goal of avoiding disparities in sentencing among similarly situated defendants.

**D.     Restitution**

The Mandatory Victims Restitution Act (MVRA) is one of several federal statutes that govern federal court orders requiring defendants convicted of certain crimes to pay their victims restitution. The MCRA concerns "offense[s] against property ..., including any offense committed by fraud or deceit." It requires, in the case of property offenses, return of the property taken or its value,

§ 3663A(b)(1).  *See Lagos v. United States*, 584 U.S. 577, 580 (2018).  The "primary and overarching goal" of the MVRA "is to make victims of crime *whole*, to *fully* compensate these victims for their losses and to restore these victims to their original state of well-being."  *In re Davis*, No. 24-3090, 2025 WL 2184111, at *12 (9th Cir. Aug. 1, 2025) (citations omitted; emphasis in original).

The defendant has agreed to pay restitution in this matter in an amount no less than $65,000,000. The United States has submitted claims to the Probation Officer that amount to $169,076,613.37, the value in U.S. dollars of the cryptocurrency the day before the declaration of bankruptcy.  As discussed below, some of the victims are seeking return of their cryptocurrency, or the highest value of the cryptocurrency since the date of the bankruptcy.

### 1.      The Court should order restitution for cryptocurrency losses in their value in U.S.  dollars

For practical reasons and reasons of fairness, the Court should exercise its discretion to award restitution for the victims' cryptocurrency losses in the form of payment of their value in U.S. dollars, rather than in-kind.  *See* 18 U.S.C. § 3663(d) ("An order of restitution under this section shall be issued and enforced in accordance with section 3664."); § 3664(f)(3)(A) ("A restitution order may direct the defendant to make a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments."); § 3664(f)(4) ("An in-kind payment described in paragraph (3) may be in the form of--(A) return of property; (B) replacement of property; or (C) if the victim agrees, services rendered to the victim or a person or organization other than the victim."); *see also United States v. Dubose*, 146 F.3d 1141, 1148 (9th Cir. 1998) ("Under the MVRA, however, while judges must impose the full amount of loss as restitution, they have considerable discretion to impose nominal, in-kind, and periodic payments.").

First, for practical reasons, the Court should eschew an order that orders in-kind payments. Though Section 3664 permits in-kind repayments, the MCVA favors repayment based on the property's value when return of the identical property is impractical.  *See* 18 U.S.C. § 3663A(b)(1) (stating that an order of restitution should require the return of the property, but where that is "impossible, impracticable, or inadequate," the defendant should pay an amount equal to the greater of "the value of the property on the date of the damage, loss, or destruction" or "the value of the property on the date of

sentencing" (less any part of the property returned)). Here, save for the cryptocurrency recouped by and held by the Cred Liquidating Trust, the cryptocurrency deposited by the Cred customers is no longer available due to the defendants' scheme to defraud.

Second, for fairness reasons, the Court should eschew an order that orders in-kind payments. This case is unlike cases in which a single victim lost cryptocurrency to a fraud or a theft. Rather, this case involves thousands of identified victims suffering losses in both fiat and cryptocurrencies. Based on the information available to the United States in the PSR, the defendant does not have the assets to repay all the CredEarn customers and Cred investors their losses at this time. Consequently, any restitution ordered by the Court might be paid periodically by defendant in installments of amounts to the Clerk of Court, which in turn will remit proportional amounts to identified victims. It is doubtful that the Clerk's office would accept cryptocurrency for restitution, and even if it did, it is doubtful that there is a mechanism for evenly dividing cryptocurrency among victims, or for balancing between cash and cryptocurrency payments among multiple victims. The value of Bitcoin, for example, has historically been volatile, fluctuating by tens of thousands of dollars. For example, on November 6, 2020, the day before the bankruptcy, it was valued at $28,979, while on August 15, 2025, it was valued at $117,537.51. Depending on when defendant repaid the in-kind Bitcoin following a restitution order from this Court, certain investors who lost Bitcoin could be substantially advantaged or disadvantaged as compared to others who lost Bitcoin based only on the value of Bitcoin at that time. If a payment plan required a certain amount of Bitcoin and cash payments per month, the value to victim customers and the cost to the defendants of making those payments could change month-to-month, creating further uncertainty and unfairness.

Third, while many of the victims seek return of the actual cryptocurrency, there is nothing unique about the cryptocurrency they would get back in an in-kind repayment plan. Cryptocurrency is fungible and generally available for purchase on a widely traded, globalized open market with U.S. dollars. For that reason, victims can use any money obtained from a restitution judgment to replace the cryptocurrency if they so choose.

U.S. SENTENCING MEMORANDUM
CR 24-00243-002 WHA                    19

### 2. The Court should value the cryptocurrency as of the date of the sentencing

If the Court declines to award in-kind repayment of cryptocurrency, then it must decide how to value the cryptocurrency in U.S. dollars which necessarily includes an assessment of when to assess its value. "The purpose of restitution is to put the victim back in the position he or she would have been but for the defendant's criminal conduct." *United States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010) (citations and quotation omitted). Because "[t]he primary and overarching goal of the MVRA is to make victims of crime whole[,] . . . uncertainties [should be] resolved with a view toward achieving fairness to the victim." *Id.* at 580 (quotation omitted). Thus, while "the statute is silent about how to value property[,] [w]hat is clear[ ] is that legislative history and case law demonstrates that the purpose of the MVRA is to fully compensate victims for their losses, and to restore victims to their original state prior to the criminal act." *United States v. Kaplan*, 839 F.3d 795, 800 (9th Cir. 2016) (citations omitted). In deciding how to award restitution, "the method chosen must comport with the congressional intent to make the victim whole. Accordingly, it would be an abuse of discretion for a district court to issue a restitution award that makes a victim more than whole, such as by awarding a windfall." *Id.* at 802.

The MVRA requires a restitution award be the greater of the value at the date of the loss and the value at the date of sentencing (less the value of any part of property that is returned). 18 U.S.C. § 3663A(b)(1). Recent cases have indicated that with respect to cryptocurrency, if its value is greater on the date of sentencing than on the date of loss, that the date of sentencing is the appropriate value. *See, e.g., In re Davis*, 2025 WL 2184111, at *13-14 (granting mandamus petition to reopen restitution proceedings where government failed to properly calculate restitution because it did not seek the value of Ether on date of sentencing); *see also United States v. Ichioka*, No. 23-cr-00190-VC, 2024 WL 2822926, at *1 (N.D. Cal. June 4, 2024) (holding that Bitcoin losses should not be repaid in kind and that restitution should be awarded based on the value of the Bitcoin on the date of sentencing). In a sense, using the date of sentencing amounts to "replacement value," providing the victims with the opportunity to replace the lost cryptocurrency. *See Kaplan*, 839 F.3d at 800 (replacement value "refers to the amount of money necessary to replace the property"). At least one Court has found that replacement value makes sense where the defendant's "fraud prevented victims from capitalizing on

U.S. SENTENCING MEMORANDUM
CR 24-00243-002 WHA                          20

positive fluctuations in the Bitcoin market." *Ichioka*, 2024 WL 2822926, at *1 (citing *People v. Ung*, 88 Cal. App. 5th 997, 1002 (2023)).

Valuing the cryptocurrency as of the date of sentencing not only comports with the MVRA, it also compensates the victims for what they lost. As the government's investigation revealed and as many of the Victim Impact Statements confirm, many CredEarn and even CredBorrow customers were drawn to Cred precisely because they did not want to cash in their cryptocurrency. Instead, they wanted to hold onto their cryptocurrency, and they viewed Cred as a safe place to deposit their assets and earn in-kind yield on it. In other words, they viewed their cryptocurrency as an investment, something they wanted to keep, and they relied on Cred to safeguard that investment. When Cred declared bankruptcy and much of the cryptocurrency disappeared, these victims did not lose cash, they lost their investments in the future. On these facts, valuation of the cryptocurrency at the time of sentencing, if higher than on the date of loss, is the only way for these victims to be made whole.

Therefore, with respect to unrepaid cryptocurrency amounts that Cred obtained through fraud, the Court should order restitution based on the value of the cryptocurrency on August 26, 2025, the date of sentencing.[7]

---

[7] Once this threshold issue has been decided regarding the timing of the valuation of the victims' losses, the Court will be able to award restitution to specific victims in specific amounts. Given the number of victims and the anticipated complexity of coordinating restitution offsets with Liquidating Trust distributions, one option for the Court's consideration is the appointment of a special master pursuant to 18 U.S.C. § 3664(d)(6) to assist with restitution and facilitate coordination with those proceedings.

U.S. SENTENCING MEMORANDUM
CR 24-00243-002 WHA                    21

## V. CONCLUSION

For the reasons stated and in full consideration of the defendant's history and characteristics, together with the goals of sentencing, the government respectfully requests that the Court sentence the defendant to a total of 40 months' imprisonment followed by three years of supervised release, a $25,000 fine, a $100 special assessment, and restitution in the amount valued to be determined based on the value of the cryptocurrency loss on the date of sentencing and, in any event, no less than $169,076,613.37.

DATED:  August 19, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

*Barbara J. Valliere*

BARBARA J. VALLIERE
PATRICK K. O'BRIEN
RICHARD EWENSTEIN
Assistant United States Attorneys