Edward Swanson (SBN 159859)
ed@smllp.law
Carly Bittman (SBN 305513)
carly@smllp.law
SWANSON & McNAMARA LLP
300 Montgomery Street, Suite 1100
San Francisco, California 94101
Telephone: (415) 477-3800

Attorneys for Defendant Joseph Podulka

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>    vs.<br><br>DANIEL SCHATT AND JOSEPH PODULKA,<br><br>                 Defendants. | **Case No.** CR-24-00243-WHA<br><br>**DEFENDANT JOSEPH PODULKA'S SENTENCING MEMORANDUM**<br><br>Date:    August 26, 2025<br>Time:    2 p.m.<br>Judge:   Hon. William Alsup<br>Courtroom: Courtroom 12, 19th Floor |

## I.    INTRODUCTION

Over his life and career, Mr. Podulka built a reputation as a hardworking and honest colleague, loving father, and devoted community member.  He worked hard to obtain graduate degrees and professional success, for years attending school on top of full-time employment.  He steadily and honestly worked his way up to more challenging professional roles, all while prioritizing his two kids and consistently volunteering to better his broader community.  He did not join Cred intending to mislead anyone, but certain choices he made there, which were completely at odds with his history and character, unquestionably had that effect.

**JOSEPH PODULKA'S SENTENCING MEMORANDUM**
*United States v. Schatt et al.*, No. CR 24-00243-WHA

Although not a justification for his misconduct at Cred, Mr. Podulka did not act out of a desire for personal gain in connection with his offense conduct. He held no ownership interest in the company and received only a modest salary relative to CFOs in comparable companies. Indeed, had Cred succeeded, the outcome would not have been particularly beneficial to Mr. Podulka, other than that his job would have continued. His actions were instead driven by a misguided sense of duty, knowing that if the company were to fail, many of the funds that customers had placed with the company would be lost. Mr. Podulka deeply regrets his actions and knows Cred's customers and investors deserved better from him. Mr. Podulka has also used the time since his arrest to reflect deeply on what allowed him to make such poor decisions in the first place and what aspects of his character led him to act as he did in the face of the pressures he experienced at Cred. That soul-searching has often been painful, though nothing in comparison with the pain his actions caused customers. But it has given him a path forward, an understanding of how to be frank with himself and others even when the truth is difficult, and a commitment to use that self-knowledge to rebuild his life in a way that his family can be proud of.

For these reasons and those discussed below, a downward variance to a sentence of 12 months and one day of imprisonment is sufficient but not greater than necessary to achieve the goals of sentencing.

## II. THE PLEA AGREEMENT AND PRESENTENCE REPORT

The parties entered into a Rule 11(c)(1)(C) plea agreement that provides for a custodial sentence between 12 months and a day and 62 months, to be followed by a three-year period of supervised release. Dkt. 97 (plea agreement), PSR ¶ 3. As reflected in the plea agreement and the PSR, Mr. Podulka's base offense level is 7, which is increased 24 levels for the loss amount, increased 2 levels for an offense involving 10 or more victims, increased 2 levels for abuse of a position of trust, and decreased 3 levels for acceptance of responsibility. *Id.* Although the plea agreement also called for an additional 2-level reduction for Mr. Podulka's being a zero-point offender, the Probation Office disagreed that this reduction applies, resulting in a total offense level of 32. *Id.* While neither Mr. Podulka nor the government object to the PSR's guidelines

**JOSEPH PODULKA'S SENTENCING MEMORANDUM**
*United States v. Schatt et al.*, No. CR 24-00243-WHA

calculation, the parties stand by the plea agreement.

Mr. Podulka has no criminal history, putting him in Criminal History Category I.  PSR ¶ 74.  The resulting guidelines range is 121 to 151 months.  *Id.*, ¶ 102.  The Probation Office has recommended a sentence of 30 months.

### III.      SENTENCING RECOMMENDATION

#### A.  The Nature of the Offense

Daniel Schatt founded Cred in 2018 as a global financial services platform for clients wanting to earn a return on their cryptocurrency and other assets.  PSR ¶¶ 7, 13.  For most of its existence, Cred operated as a legitimate business, including through the hiring of lawyers and compliance personnel, receiving lending licenses, and consistently meeting its obligations.  *Id.*, ¶ 13.  In July 2019, Mr. Podulka's joined Cred as its CFO, initially working part-time while transitioning out of the CFO role he held at his previous employer, Emergent Payments.  *Id.*, ¶¶ 14, 95-96.  After being recruited by Mr. Schatt, whom Mr. Podulka had met while working together at PayPal years earlier, Mr. Podulka joined Cred because he was impressed by the innovative company that Mr. Schatt had launched and was excited by the prospect of helping the company continue to grow.

As CFO, Mr. Podulka wore many hats and oversaw Cred's Accounting and Human Resources functions.  With his small accounting team, Mr. Podulka prepared and updated internal financial forecasts, oversaw the preparation of Cred's financial statements and tax filings, managed the ongoing financial audit by Cred's outside auditors at Armanino LLP, and managed daily cash flow planning for Cred's operational obligations such as rent, payroll, and vendor contracts.  As the only employee working on HR matters, Mr. Podulka also spent a significant amount of his time on tasks such as managing the company's payroll and benefits provider, answering employee questions regarding benefits, payroll, and expense reimbursements, creating and updating Cred's Company Handbook and related policies, preparing offer letters for company employees, and coordinating with IT to onboard and offboard employees.

While Mr. Podulka had significant and wide-ranging responsibilities within the Cred

3

organization, it is important to understand what he was not responsible for. He did not set up the business, the partnership with moKredit to earn a return on customer funds, or the hedging strategy that would be used to help protect those funds. All of that had long been in place when he arrived in mid-2019. And even after he joined the company, he was not involved in maintaining or adjusting Cred's investment or hedging strategy, and he was not communicating with JST about its liquidation of Cred's hedging positions following the "flash crash" of March 2020. Those were the responsibilities of others in Cred.

Nor was Mr. Podulka part of Cred's sales or marketing teams or its fundraising efforts.[1] He did not manage members of the sales or marketing teams, reach out to potential investors, draft or send marketing communications, conduct outreach or provide updates to Cred customers, participate in public speaking engagements, or conduct public Ask Management Anything (AMA) sessions with Cred customers. Again, those activities were all the responsibility of others at the company. Mr. Podulka did participate in the company's "All Hands" meetings and had a handful of interactions with the sales team and Cred's customers and investors in response to specific inquiries about Cred's finances. But those were infrequent contacts, and on those occasions Mr. Podulka was providing information in response to specific requests, not giving salespersons general guidance regarding their outreach or sales pitch to customers.

Mr. Podulka's connection to the offense conduct was not comprehensive, but he acknowledges that his was an important connection. When Cred's financial situation and risk profile changed for the worse in March 2020, and even as it continued to deteriorate throughout the year, Mr. Podulka worked hard to understand Cred's financial outlook and accurately report

---

[1] The PSR states that, after James Alexander was fired, the sales team reported to Mr. Podulka "regarding questions on the company's financial health." PSR ¶ 39. Mr. Podulka does not dispute that members of the sales team, including Michael Zhang and Travis Perez, would bring him questions about the company's finances. However, Mr. Podulka was not managing the sales team and had no insight into what other information the sales team received from Mr. Schatt or others at the company. Mr. Podulka has therefore objected to the PSR's characterization of the sales team "reporting" to him "regarding questions on the company's financial health." *See* Addendum to the Presentence Report, Defense Objections, ¶¶ 2-3.

**JOSEPH PODULKA'S SENTENCING MEMORANDUM**
*United States v. Schatt et al.*, No. CR 24-00243-WHA

that outlook to Mr. Schatt and others on the leadership team so they could make decisions about the company's operations, including whether and when to wind up the company's operations. In all instances, Mr. Podulka provided accurate information to Cred's decisionmakers; there is no allegation that he cooked the books or made up the numbers. But the information he provided was consistently optimistic, despite the increasing headwinds the company faced. At times, Mr. Podulka has good reason to be optimistic. For example, in the summer of 2020, Cred was exploring lucrative partnership with Visa, a company called Onsa, and a lending platform called Salt Lending. That same month, two of Cred's asset managers outperformed rises in crypto prices. PSR ¶¶ 38, 42. Weighing these potential opportunities against Cred's challenges, Mr. Podulka believed, past the point of caution and better judgment, that the company could survive the difficult months of 2020 and emerge profitable on the other side. That belief informed how he presented information to the broader company at All Hands meetings and on occasion directly to customers and investors, focusing on the positive numbers while leaving out important information about Cred's challenges. These communications form Mr. Podulka's offense conduct, because his decision to focus on positive information while not disclosing the very real and worsening negative prospects for the business resulted in his presenting an incomplete, unreasonably positive, and thus misleading portrayal of Cred's business to customers and investors. PSR ¶ 15.

Specifically, Mr. Podulka knew and understood that placing CredEarn funds with MoKredit to generate income created risk for Cred based on potential fluctuations in the price of Bitcoin, and that the hedging strategy devised and managed by others at Cred mitigated that risk. PSR ¶¶ 18-19. He also knew that as of March 2020, Cred's risk profile increased substantially when JST liquidated all of Cred's hedging positions and moKredit indicated it could not immediately meet Cred's request to recall $10 million of outstanding principal, instead requesting a payment plan under which moKredit would send $8.3 million of principal over several months, which meant that Cred was exposed to significant risk in the event crypto prices increased substantially in the short term. *Id.*, ¶¶ 24-31. Mr. Podulka also understood that Cred's situation became more dire as the year progressed, including Cred's liquidity situation worsening

**JOSEPH PODULKA'S SENTENCING MEMORANDUM**
*United States v. Schatt et al.*, No. CR 24-00243-WHA

as moKredit was unable to return principal as promised, Alexander stealing substantial assets from Cred after Mr. Schatt fired him, Cred's asset-to-liability gap increasing as Bitcoin prices rose between March and October 2020, and 800 BTC being stolen from Cred in a fraud by a purported asset manager called QuantCoin. *Id.* ¶¶ 35-41.

Mr. Podulka knew of these challenges and understood the concerns of some of his colleagues regarding Cred's financial viability. But Mr. Podulka, genuinely though not wisely, did not share their assessment of Cred's future, which led him to accentuate positive information while downplaying or omitting the negative. The result was that his communications were not just optimistic but were misleading, since his audience, whether it be internal staff or customers or investors, did not know what he and others at Cred knew about the magnitude of the challenges Cred faced. This was an enormous failure of judgment on Mr. Podulka's part: a failure to acknowledge the difficulties the company faced and speak clearly, frankly, and broadly about the problems. Again, while this was just one part of the problematic picture at Cred, and while his contribution to the larger fraud was a series of omissions rather than affirmative misstatements, his conduct unquestionably contributed to the loss experienced by Cred's customers and investors.

While undersigned counsel fully acknowledge Mr. Podulka's conduct was fraudulent and criminal, it is again important to note that he did not mislead customers or investors out of a desire for personal gain. He held no ownership interest in the company and received only a modest salary relative to CFOs in comparable startups. Although Cred's continuing through late 2020 meant that Mr. Podulka maintained his employment, Mr. Podulka did not otherwise benefit from the offense. Rather than acting out of self-interest and greed, he acted out of a misguided desire to keep the company operating long enough that it could survive its financial troubles and make good on its promises to customers. While being motivated by a desire to avoid customer losses rather than by self-interest does not justify criminal behavior, it is important context is evaluating the gravity of his conduct and measuring his culpability.

### B. The History and Characteristics of the Defendant

Mr. Podulka, now 52 years old, was in his late 40's at the time of the offense. He was

born and raised in the suburbs of Detroit, Michigan. PSR ¶¶ 79-81. His father worked in middle management at a phone company, having worked his way up from climbing telephone poles to becoming an engineering supervisor. His mother, who suffered from multiple sclerosis, was primarily a stay-at-home mom who occasionally worked for the local school or YMCA. *Id.* Although she would experience relapses in her health that required hospitalization, she consistently projected confidence for her children, and the family supported each other. *Id.*, ¶ 82. They were in many ways a typical middle-class, Midwestern family, and both parents instilled in Mr. Podulka the values that would guide him throughout his life: honesty, serving others, and hard work.

From a young age, Mr. Podulka did well in school. He especially enjoyed math and building things, and so it was a natural progression when he decided to study engineering at Michigan State University. *Id.*, ¶ 93. Having internalized the importance of volunteer work while completing service projects at his Catholic high school, Mr. Podulka continued his community service during college. At Michigan State, he was selected to be a member of Tower Guard, through which he volunteered for the Resource Center for Persons with Disabilities (RCPD) to help scribe for exams, create more accessible textbooks, and hold one-on-one tutoring. He also volunteered as a Student Ambassador for the MSU Department of Resident Life, providing campus tours to prospective faculty and helping provide students safe walks from the library to their dorm.

After earning his engineering degree in 1994, Mr. Podulka started his career working at General Motors and later Chrysler as an automative engineer, designing and testing parts for vehicles like the Dodge Neon, Chrysler PT Cruiser, and Dodge Viper. *Id.*, ¶ 97. After a few years as an engineer, Mr. Podulka rose in the ranks, but he found management to be less engaging than designing cars. His interest in how the design of automobile parts affected the overall business of building and selling cars led Mr. Podulka to attend business school at night while maintaining his full-time day job at Chrysler. He earned his MBA after four and a half years of night school at the University of Michigan, and he decided to leave engineering for a role in marketing or finance. Unable to find a position at Chrysler, he applied to a master's

7

degree program at Stanford with the goal of moving to Silicon Valley and working at the dot-com companies that he had studied during business school. When Mr. Podulka was accepted into the program, he quit his job, sold his home, and moved to Palo Alto. At Stanford, he earned a Master's Degree in Engineering Economic Systems and Operations Research and soon after landed a job at a small, start-up tech company. After that company went out of business, he went on to work as a senior financial analyst at Applied Biosciences.

In 2002, after marrying his wife Kristen, Mr. Podulka was recruited to work on eBay's Corporate Finance team. Mr. Podulka worked at eBay for 11 years, frequently changing roles due to the rapid growth of the company during that period. When Mr. Podulka's son was just six months old, the family packed up and moved to Amsterdam so Mr. Podulka could work at a company eBay had recently acquired. Soon after, the family moved to Denmark, this time so Mr. Podulka could help integrate another new corporate acquisition into eBay. While in Denmark, Mr. Podulka's daughter was born, completing their family of four. Mr. Podulka soon afterwards became Head of Finance for PayPal in Europe, during which time the family lived in Luxembourg. In 2011, Mr. Podulka and Kristen decided to move their family back to California, where Mr. Podulka took on a new role as Head of Finance for PayPal New Ventures in San Jose, and the family purchased the home in Palo Alto that they live in to this day.

By 2014, Mr. Podulka had grown tired of the corporate culture he was experiencing at PayPal. He was also interested in pursuing a CFO role that would allow him to learn about a different industry and oversee aspects of a company at a higher level. He soon accepted a position as CFO and VP of Finance at the San Francisco Chronicle, which was looking for a CFO with a tech background who could help the organization shift from print to digital. Mr. Podulka found working there to be a great learning experience, but he decided to leave after a year and a half. He missed the corporate agility and innovation that he had experienced while working in Silicon Valley, and he found the commute to San Francisco difficult to manage while his young children attended school in Palo Alto. Mr. Podulka moved on to work as CFO at a small fintech company called Emergent Payments, where he stayed until the company was acquired and later resold. In 2019, Mr. Podulka started his own business, which continues to this

8

day, through which he provides consulting services in finance and human resources. PSR ¶¶ 94-96. Also in 2019, Mr. Podulka reconnected with Mr. Schatt, who he had known at PayPal and who recruited Mr. Podulka to join Cred as its CFO.

While Mr. Podulka's adulthood was defined to some extent by his professional successes, it was shaped in larger part by his commitment to his family. In her letter to the Court, Mr. Podulka's wife describes how Mr. Podulka always put their family first, showing up every day as a "deeply present and engaged father." Exhibit A. The letters from Mr. Podulka's broader family members and friends similarly describe Mr. Podulka's devotion to family, each telling how Mr. Podulka consistently showed up in the day-to-day lives and activities of his kids (now ages 18 and 15), whether it be through coaching youth sports teams, cheering them from the stands, helping them with their schoolwork, or just showing them love and support through his consistent presence. *See* Exhibits B-H. His friend Lori McCormick writes:

> When the high school needed parent volunteers to start the inaugural girls' flag football team, Joe jumped in to help the coaches and support the program. I've lost count of how many teams Joe has helped coach for his son and daughter. Whether it was a lacrosse game in the rainy springtime, soccer in the chilly winter, or football in the fall, Joe is a mentor and cheerleader to his kids and their teammates. These are a few examples of how Joe consistently shows up for his family in both big and small ways.

Exhibit F. As his brother-in-law and sister-in-law aptly put it: "His love for his family is evident in every interaction, and they, in turn, adore and rely on him deeply." Exhibit H.

The letters from Mr. Podulka's friends and family also describe how Mr. Podulka's generosity extends beyond his own children to his broader family and community. Mr. Podulka's sister describes how her own children call him to help them with math homework and how Mr. Podulka "has always been patient and willing to walk them through the problem, helping them eventually solve the equation on their own." Exhibit B. She writes with admiration that she tries "to emulate [Mr. Podulka's] thoughtfulness towards others, but for Joe it seems to come without even thinking." *Id.* Mr. Podulka's brother-in-law and sister-in-law similarly express that Mr. Podulka "regularly encourages [their] children's academic, athletic, and creative pursuits and is always available with thoughtful advice and unwavering support."

9

Exhibit H.  Mr. Podulka also offers his home and food to friends in need, volunteers at beach cleanups and the PTA, and has served as a board member of the Gunn High School Sports Boosters, Partners in Education (which raises money for the benefit of Palo Alto Unified School District students), and Palo Alto Community Child Care (a nonprofit organization that provides equitable child care in Palo Alto).  PSR ¶ 84; Exhibit A; Exhibit F; Exhibit D.

Mr. Podulka shows up for his family and community in these ways not because he wants any acknowledgement of his support but because doing so aligns with the values that he has lived by since high school and hopes to impart on his children.  According to his wife, Mr. Podulka "has always been the first to help a friend, neighbor, or stranger, doing so quietly and without seeking recognition."  Exhibit A.  In her letter, Jessica Engelke similarly emphasized Mr. Podulka's quiet support for the broader community:

> I regularly witness individuals who quietly strengthen their communities through acts of service, coaching, mentoring, and simply showing up.  Joe is one of those individuals.  Beyond just showing up, he coordinated all aspects of sports paperwork and scheduling and often provided rides to practice not just for his children but for any family who needed a hand.  Whether organizing the logistics of the games with parents and other coaches or offering an extra pep talk to one of the kids, his steady presence and willingness to support others, especially youth, reflect a kind of leadership that is deeply meaningful, even when it goes unnoticed.

Exhibit E.

Given the role Mr. Podulka has played in the lives of his family and community, it was painful for him to acknowledge to them what he had done at Cred that led to people losing their money.  In her letter, Kristen Podulka explains how her husband "has been filled with anxiety, shame, and remorse from the very beginning" of the case.  But Mr. Podulka did the hard work, and she writes that he has "taken full accountability, and expressed not only sorrow for the harm caused to others but deep regret for the pain that this has brought into our home."  Exhibit A.

In his letter to the Court, Mr. Podulka acknowledges the profound toll his actions have had on the victims and on his family.  His response has been to commit to making restitution to the victims while also working to understand the patterns of behavior and thinking that led to the decisions that have brought him before the Court.  He writes:

**JOSEPH PODULKA'S SENTENCING MEMORANDUM**
*United States v. Schatt et al.*, No. CR 24-00243-WHA

> Through therapy and the support of those closest to me, I've committed to facing my problems directly and doing the internal work I once avoided. I know that no amount of money will ever make up for what was lost. But I hope to keep contributing financially toward restitution, while doing everything I can to be a stable presence for my friends, family, and community.
>
> This experience has forced me to see the world (and myself) with painful clarity. I understand the seriousness of the wrong I committed, and I will spend the rest of my life working to be a better man—one who is worthy of forgiveness, trust, and a second chance.

PSR ¶ 58. This work has been hard, and, as Mr. Podulka acknowledges, it has just begun. But to regain the respect of his community and to be the role model he has aspired all of his life to be for his son and daughter, he is committed to a path of transparency and honesty, and a lifetime of effort to make restitution to his victims while also supporting the people in his life.

**C.**      **The Sentencing Guideline Range Provides Limited Guidance Because it is Not Based on Empirical Evidence or National Experience**

The Sentencing Commission "fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) (citation and quotation omitted). Thus, "in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* (citation and quotation omitted). Where, by contrast, a Sentencing Guideline is not the product of the Sentencing Commission exercising its "institutional role" of promulgating guidelines based on empirical data and the national experience, it is not an abuse of discretion for a sentencing court to conclude that the Guideline range is greater than necessary to achieve the purposes of sentencing in 18 U.S.C. section 3553(a). *Id*. at 109-110; *see also Spears v. United States*, 555 U.S. 261, 264 (2009).

The original fraud guidelines (formerly, § 2F1.1), adopted by the Sentencing Commission in 1987, were the product of the kind of empirical analysis that warrants deference by the courts. That empirical work led the Commission to recommend definite, but short prison sentences for

11

white collar offenders.  The Commission found that, "[a] large portion of fraud, embezzlement, and tax evasion offenders received simple probation."  U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing* Reform, at 56 (Nov. 2004) [hereinafter *Fifteen Year Report*].  Accordingly, one of the key purposes of the original, 1987 guidelines was to ensure that white collar offenders faced "short but definite period[s] of confinement."  *Id*.  The Commission opined that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm."  U.S.S.G., ch. 1, intro., pt. 4(d) (1987).  Under the empirically-supported original guideline, Mr. Podulka's enhancement for "loss" would have translated to an increase of 11 levels (U.S.S.G. § 2F1.1 (1987))[2], not 24.

By contrast, the more than twofold increase in the guideline ranges since the Commission's original work is not the product of empirical analysis.  The Commission's progression to a 24-point enhancement reflects preferences of the Commission only, not reliable research data.  *See* U.S.S.G., App. C., Amend. 154 (Nov. 1, 1989) (1989 amendment increasing the loss enhancement to provide additional deterrence); and U.S.S.G., App. C., Amend. 617 (Nov. 2001) (2001 amendment to the guidelines increasing the applicable enhancement based on the Commission's desire to respond to "comments received from the Department of Justice, the Criminal Law Committee of the Judicial Conference, and others, that [the guideline] under-punish[es] individuals involved in moderate and high loss amounts[.]").  Yet objective social science research refutes the Commission's unsupported position that increasing the length of incarceration or white-collar offenders promotes the goals of sentencing.  *See, e.g.*, Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-49 (2007) ("there is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); Michael Tonry, *Purposes and Functions of Sentencing*, 34

---

[2] Available at: https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_E-K.pdf

**JOSEPH PODULKA'S SENTENCING MEMORANDUM**
*United States v. Schatt et al.*, No. CR 24-00243-WHA

Crime & Just. 1, 28 (2006) ("certainty and promptness of punishment are more powerful deterrents than severity . . .increases in severity of punishments do not yield significant (if any) marginal deterrent effects."); *see also* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999), Institute of Criminology at Cambridge University (accord).

These harsh guidelines for fraud cases have long been the subject of criticism. Notably, on August 6, 2025, the Sentencing Commission announced that it will consider reforms to the federal sentencing guidelines for fraud offenses, including "to ensure the guidelines appropriately reflect the culpability of the individual and the harm to the victim, including [] reassessing the role of actual loss, intended loss, and gain." *See* Federal Register Notice of Final 2025-2026 Priorities, available at: https://www.ussc.gov/policymaking/federal-register-notices/federal-register-notice-final-2025-2026-priorities.

Mr. Podulka does not dispute the loss amount in this case nor that the loss amount is both significant and reflective of the deep financial harm that he, Mr. Schatt, and others caused Cred's customers. However, the offense-level enhancement associated with that amount is not grounded on empirical data and results in a guidelines range greater than necessary to achieve the goals of sentencing.

### D. The Goals of Sentencing Can Be Achieved by a Sentence of 12 Months

A sentence of 12 months and a day is sufficient to reflect the seriousness of the offense, provide just punishment, and deter others from committing similar crimes. A year in federal prison is a serious punishment. When coupled with the fact that Mr. Podulka will need to rebuild his life and career after prison while under the shadow of a federal conviction and an enormous restitution judgment, the sentence recommended by the defense provides just punishment for the offense and will afford general deterrence, particularly when measured against the type of conduct Mr. Podulka engaged in here—deception motivated not by a desire for personal gain, but by a misguided desire to keep the company afloat for the benefit of its customers—and measured against Mr. Podulka's limited role in interacting with Cred's sales team, customers, and investors.

The recommended sentence also provides sufficient specific deterrence. Mr. Podulka's conduct here is completely at odds with the record of integrity and service that he has demonstrated throughout his life. He has no criminal history and has never spent a day in custody. He will be separated from his children, missing significant events in their young adult lives, and will be prevented from seeing his elderly father, who has recently been hospitalized for issues with his heart. In cases where the defendant faces his first incarceration, even a short period of confinement often achieves just punishment and deterrence. *United States v. Baker*, 445 F.3d 987, 992 (7th Cir. 2006) ("a prison sentence would mean more to [a defendant who has never been imprisoned] than to a defendant who previously had been imprisoned. Consideration of this factor is consistent with section 3553's directive that the sentence reflect the need for 'just punishment' and 'adequate deterrence.'").

Indeed, Mr. Podulka has been deterred before serving a single day of his sentence. He has taken full responsibility for his conduct and the financial harm that his decisions caused Cred's customers and investors. Mr. Podulka has taken a "hard, honest look at what went wrong and how [he has] changed since." Through his self-reflection and with the help of a therapist, he has come to understand more about his difficulty in dealing with conflict and facing uncomfortable situations, and how that avoidant behavior, combined with his misguided sense of duty to keep the company afloat at the cost of being honest and transparent with customers, influenced his decisions at Cred. Mr. Podulka fully recognizes and admits that he made inexcusable decisions, decisions that constituted criminal conduct, and decisions that caused real harm to customers. He deeply regrets those decisions, and he understands and agrees that he must be punished for them.

## IV.    CONCLUSION

Given Mr. Podulka's lack of criminal history and the aberrant nature of his conduct in this case, his long history of volunteer work and gainful employment, his proven dedication to his family and community, his motivation for participating in the fraud, and his fulsome acceptance of responsibility, a sentence of 12 months and a day in custody is sufficient but not greater than necessary to meet the goals of sentencing. Additionally, given the significant

14

amount of restitution Mr. Podulka has agreed to pay, and in light of Mr. Podulka's anticipated challenges finding employment after his custodial term, the Court should not impose a monetary fine.

Dated: August 19, 2025

/s/ Edward Swanson
EDWARD SWANSON
CARLY BITTMAN
SWANSON & McNAMARA LLP
Counsel for Joseph Podulka

**JOSEPH PODULKA'S SENTENCING MEMORANDUM**
*United States v. Schatt et al.*, No. CR 24-00243-WHA

EXHIBIT A

Dear Judge Alsup,

My name is Kristen Elizabeth Podulka. I've been married to Joe for 23 years, and I've known him since I was 20 years old. We have two children together, Ryan (18) and Emily (15). I own a Reiki Energy Healing business in Palo Alto, California, where we've lived for 14 years. I am writing to share who Joe is at his core, as a husband, father, and human being.

Joe has always put our family first. He is a deeply present and engaged father. From the day our children were born, he has taken an active role in every part of their lives. He has never missed a game, whether it was soccer, flag football, or lacrosse. He has volunteered as a scorekeeper, assistant coach, and referee. He drives them to practices, attends end-of-season parties, and handles their uniforms, paperwork, and medical forms. He does it all out of joy, not obligation.

Joe is equally involved in their academic and everyday lives. He goes to school concerts, art shows, science fairs, and parent-teacher conferences. He volunteers for field days, helps with homework, and manages their calendars. Since COVID, he has worked from home, which allowed him to create a cherished daily ritual with our kids: high-fiving them every single day they walk through the door after school. That simple moment has become a meaningful symbol of presence and consistency in our family.

We eat dinner together most nights, watch shows together as a family, and take yearly vacations. Our kids don't retreat to their rooms like most teens. They talk with us daily. Joe's presence in our home is foundational. It holds everything steady. Losing that will not just be hard. It will be life-altering.

Ryan is preparing to attend the University of Colorado Boulder in the fall. He already struggles with anxiety and is working hard to manage the emotional weight of this major transition. Joe is his role model and anchor. Being apart from him during these critical years will be painful. Ryan will miss his dad's steady presence, encouragement, and support. But even during a period of separation, I know Joe will remain deeply connected to Ryan through emails, phone calls, and video visits. He will continue to be a grounding force in Ryan's life in every way he can.

Emily is 15 and at a tender, formative age. She is growing from a child into a young woman and relies deeply on her dad's guidance and support. She still curls up next to him on the couch and turns to him for help with homework, comfort, and reassurance. His physical absence will be incredibly difficult for her. I worry that it will shake her sense of security. But I also know Joe will make every effort to stay emotionally present for her, to check in often, and to remind her that he is with her in all the ways he can be.

Joe is not only a devoted father and husband. He is someone who lives with integrity, generosity, and humility in every area of his life. He has always been the first to help a friend, neighbor, or stranger, doing so quietly and without seeking recognition. Over the years, he has given his time to California beach cleanups, served on our school district's Sports Boosters, volunteered with the PTA, and attended fundraisers for organizations like the Bill Wilson Center and West Valley Community Services. He also supports the College of Engineering at Michigan State, his alma mater, as a proud and honored alumnus. Joe always shows up with care and a deep sense of responsibility.

This past year has tested us in ways I never imagined. Many marriages might not survive this kind of stress. But I am not going anywhere. I know who Joe is at his core. He is not a bad person. He made bad decisions at Cred and is taking full responsibility for them. He is a changed man because of this. I have seen him begin to grow in real and meaningful ways. He is learning to communicate more openly and to slow down before making decisions. He carries a deeper awareness of how his actions affect others and holds that awareness every day.

In all the years we've been together, I've only seen Joe cry a handful of times, during our wedding vows, the births of our children, and his mother's funeral. During this experience, he has broken down more than I've ever seen. Since the day of his arrest, I've been deeply worried about his mental and physical health. He has lost weight and the spark in his eyes. He has been filled with anxiety, shame, and remorse from the very beginning. He has apologized to me, taken full accountability, and expressed not only sorrow for the harm caused to others but deep regret for the pain this has brought into our home.

Thank you, Your Honor, for taking the time to read this letter. I respectfully ask for your compassion in sentencing. Joe is someone who still has so much more to offer—to our family and the community around him. We hope that with your leniency, our family can begin to rebuild and stay closely connected through this difficult chapter.

With sincerity and gratitude,
Kristen Elizabeth Podulka

EXHIBIT B



June 10, 2025

The Honorable William Alsup
San Francisco Courthouse, Courtroom 12 - 19th Floor
450 Golden Gate Avenue , San Francisco, CA 94102

Your Honorable William Alsup,

I am writing to you to in support of my older brother Joseph Podulka, who is currently before your court. I am honored to provide some insight about Joe, who he is and what he means to his family.

It wasn't until I got older that I realized all of my brother's accomplishments. In 1999 he sold everything he owned to move across the country to continue his education at Stanford University. A dream! He married is college sweetheart from Michigan State University and started a family. Joe and his wife Kristen of 23 years are blessed with two children, Ryan (18 years old) and Emily (15 years old). Ryan will start his first year at University of Colorado Boulder in the fall and Emily is a rising sophomore at Gunn High School where she plays soccer and flag football.

Joe is a loyal family man and sets a good example for his kids. He prioritizes his family first, never missing a sporting event or helping to plan college tours. Ryan and Emily know how loved they are and how important they are to him on a daily basis, he is the rock for his family. Joe makes time to help other family members too, my own kids have had to call him to ask questions about their math homework and he has always been patient and willing to walk them through the problem, helping them eventually solve the equation on their own. When it is gift giving time, Joe goes out of his way to be thoughtful. The best was our Dad's 70th birthday in 2018, when Joe was working at Emergent Payments. Joe gave him a globe and said pick anywhere you want to go! They ended up at a Boston Red Sox game together, because my Dad just really wanted to spend time with him.

Throughout the years and our busy schedules we have always kept in touch. Keeping each other updated on our family and work life. I have always been impressed hearing about a new job opportunity or current role he held. In awe of just how intelligent Joe is. Dedicated to being a good husband, father, son, brother and person. I remember the first time I came to visit him in California and Joe took me sightseeing in San Francisco. We got pizza from some corner shop and he ended up giving his slice to a homeless man who was outside the restaurant. It is those moments of instinctive but quiet generosity that are so characteristic of Joe. I try to emulate his thoughtfulness towards others, but for Joe it seems to come without even thinking. It is the little things like that, that make knowing Joe an honor. Yeah, he is my brother (3 years older) and I look up to him, but I truly admire Joe. I am proud of his impressive resume, all the hard work he put in to be successful paid off. He gave up a lot to continue his education and work in a field that he loves. I would google his name and read articles about him (he would never brag). I sure do on his behalf though!

Joe is an honest person, ask anyone that knows him and they would all agree. Despite the mistakes he made and his guilty plea he is still employed and working for/with people who trust him and look to him for his knowledge and experience. His colleagues respect him just as much as I do. He is the kind of person one would want to be friends with but I am lucky enough to call Joe my brother.
Please, specifically for his children, Ryan and Emily, and for all of the good he has done in his life, please be compassionate in sentencing.

Thank you,
Amy Neira

EXHIBIT C

The Honorable William Alsup
San Francisco Courthouse, Courtroom 12 - 19th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

I am writing this letter to you, because I have known Joe longer than anyone. I am his dad. I am not being naive or looking at his situation through rose colored glasses, but I want you to know Joe as I and others know him.

Joe has always had a positive view of people and situations. His mother (my wife), suffered from Multiple Sclerosis, a debilitating disease. Whenever Joe saw her or called her, he would always tell her how good she looks and how she seems to be doing better. This raised her spirits and helped her keep a positive attitude which her doctors said was very important for her condition. Joe and I talked sports a lot. If I would comment on a particular player being a poor hitter, Joe would reply that even though this player is having his problems at bat, he plays good defense and helps the team in that way. There are other examples I could give on how he has reacted to various situations in the same way. In my life, I often reflect on situations I have faced and wished I had his attitude and handled problems the way he did.

People who know Joe are all aware of the good family man he is. The family's need come before his. Several years ago, his wife fell and crushed her ankle that required several surgeries to repair. He put all of his personal needs aside, like playing soccer, attending various events etc. to make sure her recovery was a success. Included in that was handling all of the household chores. He also is a devoted dad to his kids. He helps them with school, attends all of their sporting events, drives them and their friends when they needed transportation and encouraged them when they were having problems. I know this sounds like what every dad does, but the kids come first above all. His son will be attending college this upcoming year and he made time to try and visit as many of the schools he had applications at so Ryan could make a good decision on where to go.

Joe has always been a hard worker. He had odd jobs while attending high school and while earning his undergraduate degree from Michigan State he worked jobs on campus. Working full time after graduation, he was able to earn his MBA from the University of Michigan. Finally, he ended up attending Stanford earning a second Masters degree in Engineering-Economic Systems and Operations Research. His career began after that.

I hope this letter helps define the person Joe really is and helps you know him more as a person than a name on a paper. I am proud of the man he is and will always love him.

Finally, I know Joe is concerned, scared and down about the situation he is in. I believe these emotions are more about his family than himself, but that is Joe.

I want to thank you for taking the time to read my letter and hope some of these examples help you know Joe a little better.

Gary Podulka

EXHIBIT D

Jennifer Keicher and Todd Pfeffer

██████████

Redwood City, CA 94061

June 25, 2025

The Honorable William Alsup
San Francisco Courthouse, Courtroom 12 – 19th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Re: Letter of Support for Joe Podulka

Dear Judge Alsup,

We are writing this letter in support of Joe Podulka.  We met him eighteen years ago in a parenting class at Stanford while both couples were expecting their first-born son.  We started a friendship on that day that has maintained while Joe and Kristen lived oversees, and then, to our delight, returned to the Bay Area to continue raising their kids.  While we are in very different careers (Jennifer works in special education at a local school district and Todd is a relocation agent), we established a friendship based upon solid family values and human kindness.

I know that Joe's upbringing was dramatically different than his kids, and that he has worked hard to ensure his kids have a supportive environment. His dad was not very present or supportive as Joe was growing up, and as such, he worked hard to ensure he was a constant presence in his own children's lives. While a midwestern man to his core, he has been able to step out of the traditional patriarchal role and be introspective to what his kids need.  Joe is a hands-on dad, very supportive of all that his kids choose to do.  He has always been a constant presence at their games. Showing up and supporting them was of huge importance to him, whether that meant coaching or cheering from the stands, or having a big debrief after a game. Kindness is another trait we have seen over the two decades, supporting friends and family members who needed it, and making sure his family was taken care of.  Offering his home and providing food to friends in need, supporting his local community school with donations and volunteer time. He was a superstar dad when Kristen broke her ankle; cooking, cleaning, shuttling kids to school and games all while juggling an extremely demanding job.  While he accepted help from friends, he often chose to do things himself, knowing the kids preferred him being the one to help them.  Family always comes first for Joe.  One example is the cherished family cat, Bob. Joe is allergic to animals, but after some lobbying by the kids, was won over by their persistence and now Bob claims him as his number one human.

Joe is always someone we can rely upon, and we are thankful for his friendship over the years. As transplants from out of state, together with his wife Kristen, they have built a community of

friends who know they are welcome at their home for holidays, weekends, and anytime that additional support is needed.

He has shared with us the federal charges and the full weight of the consequences.  His main concern has been of the impact to his family, with one child who struggles with anxiety at the point of heading to college and his daughter in high school at a very pivotal time in her development.  He expressed how worried he is about the future for his family.  While I am sure he has other fears that are work/career related, the family impact has been what we have discussed.

In closing, we appreciate the time you have given thus far to consider the appropriate sentencing and put forth our hope for lenience.

Sincerely,

Jennifer Keicher
Todd Pfeffer

EXHIBIT E

To the Honorable Judge,

My name is Jessica Engelke, and I serve as both a professor at Southwestern Oregon Community College and the elected Mayor of North Bend, Oregon. I've known Joe personally since 2007, and over the years, my husband, Steve Ryan, and I've spent time with him and his family during holidays, events, and everyday moments that left a lasting impression on us.

Our children have also grown-up knowing Joe. They've spent time with him in family settings, and he has been someone they've looked up to. As parents raising our daughters here in the United States, we've come to appreciate the positive role models who help shape their understanding of community, service, and character, and Joe has been one of those people. He has volunteered as an assistant coach, served as a referee, and regularly attended every game. His consistent presence and encouragement on and off the field made a meaningful impression not only on his daughter and son but on many of the families in his community.

Joe is a devoted husband and a hands-on, engaged father. In my work as a professor of human relations, I study the impact of family dynamics on long-term well-being. The presence of a caring and supportive parent during high school plays a critical role in a child's emotional development, academic performance, and future career path. Joe's involvement in his daughter's life during these remaining three high school years will significantly impact her confidence, stability, and future opportunities.

 In both my academic and civic roles, I regularly witness individuals who quietly strengthen their communities through acts of service, coaching, mentoring, and simply showing up. Joe is one of those individuals. Beyond just showing up, he coordinated all aspects of sports paperwork and scheduling and often provided rides to practice not just for his children but for any family who needed a hand. Whether organizing the logistics of the games with parents and other coaches or offering an extra pep talk to one of the kids, his steady presence and willingness to support others, especially youth, reflect a kind of leadership that is deeply meaningful, even when it goes unnoticed.

This experience has had a profound effect on Joe and his family. While I understand the legal process must take its course, I respectfully ask the Court to consider his ongoing role as a father during this formative stage of his daughter's life.

This conviction does not define Joe. He is a family man, a community member, and someone who is working to move forward with honesty and accountability. I ask for leniency in his sentencing so he can continue to be a guiding presence for his daughter during these crucial years.

Please also take into consideration that these comments reflect not only my perspective but also that of my husband, Steve Ryan, who has known Joe for just as long. Together, we have

witnessed the positive impact that Joe has had on our family, his neighborhood, and the broader community.


Sincerely,


Jessica Engelke

 Mayor, City of North Bend, Oregon

 Professor, Southwestern Oregon Community College

EXHIBIT F

June 29, 2025

The Honorable William Alsup
San Francisco Courthouse, Courtroom 12 – 19th Floor
450 Golden Gate Avenue, San Francisco, CA 94102

Dear Honorable Judge Alsup,

I write this letter in support of Joe Podulka, whom I have known since 2012 as a close family friend. Joe is a quiet, thoughtful person, a dedicated father and husband, and a respected member of our community.

One of my earliest memories of Joe is from a barbecue at his home. My youngest son was a newborn, and Joe happily held him in his arms most of the evening. He had a natural calmness that soothed my baby into a deep sleep. That small but powerful moment has stayed with me, partly because it was one of the first times I socialized with Joe, but moreover, because in that moment, I knew exactly the type of man Joe was: a family man.

I served alongside Joe on the Board of Directors for Palo Alto Community Child Care (PACCC), a nonprofit organization that provides quality and equitable child care in our community. I nominated Joe when the board was looking to add someone with a background in finance. Joe's children had participated in PACCC's after-school program at their elementary school, so he brought not only his professional experience in finance but also his lived experience as a PACCC parent to every board meeting. After leaving PACCC, Joe continued to serve our community, coaching sports teams, volunteering with other non-profit organizations, such as Partners in Education, and joining the high school's Sports Boosters, where he continues to advocate for our youth.

Joe is a man of unquestionable integrity. Above all else, he is a devoted family man. His wife, Kristen, and their children are the heart of his life. He is fully engaged in the day-to-day activities of his kids. His relationship with his children is characterized by mutual trust, deep affection, and genuine respect. His marriage to Kristen is one of true partnership—she is his best friend, and they are united in their commitment to their family's well-being.

About ten years ago, Kristen suffered a broken ankle (and two surgeries to repair it) that left her unable to walk for over one year. Joe did not hesitate to roll up his sleeves and

take on the full weight of tending to her recovery while juggling his work schedule and the needs of their young children. He did so without complaint. I often offered my help, but Joe always said, "No, I got this." And he did. Joe leaned into his role as caregiver.

When the high school needed parent volunteers to start the inaugural girls' flag football team, Joe jumped in to help the coaches and support the program. I've lost count of how many teams Joe has helped coach for his son and daughter. Whether it was a lacrosse game in the rainy springtime, soccer in the chilly winter, or football in the fall, Joe is a mentor and cheerleader to his kids and their teammates. These are a few examples of how Joe consistently shows up for his family in both big and small ways.

Joe and Kristen are proudly from Michigan and have maintained their Midwestern mindset. A fun fact: their front door is painted green to represent Michigan State University, where they attended school and fell in love. Joe and Kristen are raising their children with those same Midwestern values. Their children are kind, empathetic, curious, and committed to their education and extracurricular activities. The Podulka's are not people of extravagance or excess. Their lives are grounded in purpose, stability, and strong moral character.

Writing this letter allowed me the time to reflect on my decade-plus relationship with Joe and his family. It is an honor to speak of the impact Joe has had on his family, his friends, and his community. Thank you for considering my letter of support for Joe Podulka.


Sincerely,


Lori McCormick, family friend of the Podulka Family

EXHIBIT G

The Honorable William Alsup
San Francisco Courthouse, Courtroom
12 – 19th Floor 450 Golden Gate Avenue,
San Francisco, CA 94102


Your Honor,

This letter is in support of Joe Podulka.   By way of introduction, my name is Mitchell Davis and I am a seasoned technology executive and investor.  I have known Joe Podulka for a decade.  As the Founder and CEO of Live Gamer Inc, I hired Joe as CFO and continued to work with him after that company was sold to Emergent Technology Inc.  I have also employed Joe as fractional CFO and consultant at several other companies over the last 10 years including DrivePro Inc.

I have always found Joe to be a hardworking, skilled professional that has proven to be very reliable.  I've employed him at multiple companies not just because he does great work but also because he is just a very solid, forthright person that people like working with and can rely on. I've always found Joe to be of high integrity and a producer of high-quality work product.

Joe's a strong family man with two wonderful kids and delightful wife.  He's always prioritized his family and takes his kids to school, events, sports games and is closely involved.  He's also active in the local community, playing sports and doing various community projects.

He made us aware of this case early on and has kept us apprised.  I know for a fact that it has been a terrible strain on Joe and his family.  For my part, I have always taken the view that Joe is a stand-up guy and always looks to do the right thing, although he has acknowledged to me his errors at Cred and has taken full responsibility for his actions in this case.  All of that said, I hope that you are able to view that in the context of his long history of contributions to the technology community in Silicon Valley, his local community and his family.

Thank you for considering this letter and Joe's future.


Sincerely

Mitchell Davis

EXHIBIT H

**The Honorable William Alsup**
San Francisco Courthouse, Courtroom 12 – 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Judge Alsup,

We are writing to respectfully request your compassion and leniency as you consider the sentencing of our brother-in-law, Joseph (Joe) Podulka.

We are Erin and Timothy Galvin, members of Joe's extended family. Erin is a Veterinarian Recruiter for Mission Pet Health, and Timothy is an Executive Vice President and Account Director with McCann Worldgroup. We have known Joe since 1997, when he began dating Erin's sister, Kristen. He officially became part of our family in 2002 when they were married and has been a steady, valued presence in our lives ever since.

Over the past 25+ years, we've shared countless holidays, family milestones, and vacations with Joe. Despite living in different states—and even different countries—we've remained close. Joe has been a devoted brother-in-law and a caring, supportive uncle to our two children. He is someone we've always known we could rely on.

In 2017, when Tim was laid off during a company restructuring, Joe reached out immediately to offer financial support, knowing Tim was the primary income earner in our household. While we ultimately did not need assistance, the gesture spoke volumes about Joe's character and willingness to help family in times of need. Joe has also contributed generously to our children's college savings funds—an incredible act of kindness that has lessened our financial burden and reflected his belief in the value of education. He regularly encourages our children's academic, athletic, and creative pursuits and is always available with thoughtful advice and unwavering support.

Joe is intelligent, capable, and deeply kind. He holds degrees from Michigan State University, the University of Michigan, and Stanford University, and has built a successful career in finance, with leadership roles at eBay, PayPal, and the San Francisco Chronicle. Despite his professional accomplishments, he has always remained humble and grounded. When our son was applying to Michigan State, Joe, a proud alumnus, wrote a sincere and heartfelt letter of recommendation that meant a great deal to our family.

Perhaps what we admire most is Joe's unwavering devotion to his wife and children, Ryan and Emily. He is not only a dedicated provider, but a present and engaged father—coaching youth teams, supporting schoolwork, and always showing up for them. His love for his family is evident in every interaction, and they, in turn, adore and rely on him deeply.

We know Joe is devastated by the events that have brought him before you. He has accepted responsibility and is clearly remorseful. From our perspective, this incident does not define him—it is a painful chapter in the life of someone who has otherwise lived with integrity and purpose. We believe Joe is committed to learning from this experience and to continuing to contribute positively to his family and community.

Thank you for taking the time to consider our perspective. We respectfully ask for your compassion and leniency as you determine Joe's sentence.

Sincerely,
Erin and Timothy Galvin